This is McCombs v. Gaddis, No. 518-0407. Counsel, ready to proceed, then? Yes, sir. Okay. May I please call you? Mr. Cantrell. I am Darrell Dunham. I represent the respondent appellant in this case. This is an order of protection case. The petitioner respondent are neighbors. They've been neighbors for about 10 years. I think the first few years' relationship was good. It began to sour when the petitioner, Ms. McCombs, began feeding some cats. My client objected to that. Finally, he started trapping the cats and taking them to the Humane Society. Then, in the fall of 2017, my client believed that there was a tree that was on the petitioner's property and began to lean that endangered his house. There was a fracas where the police were called, and an order of protection was filed by Ms. McCombs against my client back in the fall of 2017, which was eventually dismissed. And then we fast forward to the instant case. I don't think there's any dispute, can be any dispute, that in June 29 of 2018, that there was an event that occurred throughout the day. But I'd like to start with the, there's two aspects that the trial court focused on in deciding to grant a plenary order of protection and denying the motion for reconsideration. The first one is there is an allegation in the verified petition for the order of protection that there was a series of events that occurred in May of 2018. Now, in the record, there's all kinds of statements made in the petition, but in the actual record, it's found at page E25 through E27 of the transcript. The only thing that Ms. McCombs testified to is that my client, on six occasions, was found either on his property or on the sidewalk in front of his property. She seemed to take great concern about the fact that it was raining that day, and then there was a photograph of him supposedly staring at her while she was in her house. My client testified he didn't even know that she was there. There wasn't any evidence disputing that. But that's the first event that we're talking about. There's no testimony that he shouted at her, that he threatened her. Throughout any of these proceedings ever has my client ever threatened Ms. McCombs with physical violence. There's no evidence that he has a weapon. There's no evidence of any of that. Counsel, what about the statement at some point, maybe we'll get to the last thing as you're laying this out, where he shouted, or his testimony, he shouted, you're not coming back from this? Now we are moving forward to June 29th, 2017. So if I can move forward to June 29th, 2018. My client, he was actually arrested two times that day. The first time he was arrested, he was arrested for violating an order of protection. Now, so the fact of the matter is that there wasn't any order of protection in place. The one that Ms. McCombs had filed had been vacated. They make a big dedual about the fact that there are others that have filed orders of protection against my client. But this is the only one. This one right here is the only one that's in place. The other ones have always been dismissed. There's no dispute that there is bad blood between these parties. But my point is, I don't think an order of protection statute would be used as a way of bludgeoning your neighbors. And that's exactly what I think has happened in this case. So my client, in the mid-morning hours of that day, police come out, and they arrest him for violating an order of protection. And so he tries to explain to them there is no order of protection. They don't listen. He gets jailed for three or four hours. He gets released from jail. Then he comes back in. He has to walk back into the neighborhood because that's one of the issues that the trial judge tried to get him. He said, well, I'm confused. I think his testimony is inconsistent with regard to his vehicle. I think the record is very clear what happened. His vehicle was parked near the police station, which is very close to the neighborhood where these folks live. It's about an hour away from the jail. In the afternoon, he's released from the jail. He walks through his neighborhood to get to his vehicle, and it's absolutely clear what happened. So he admits he comes back into the neighborhood in a pretty highly agitated state. And now he believes, I think reasonably, that it's either Ms. McCombs, the petitioner in this case, or her neighbor, who had also filed an order of protection against him, which had been dismissed, had called the police the first time and effected an arrest against him. Now, I think if – and then we have – When they first arrest the neighbor, what was the neighbor's complaint? I think it's very similar. It's a similar thing. They're objecting to his behavior. They don't like the way that he's addressing them. Didn't the neighbor make the same kind of complaint? Let's say his behavior was somewhat erratic. Say again? Somewhat erratic. Well, okay. Not just walking into the neighborhood like, you know, nothing's happened. There's nothing in this record that I believe could justify a finding that my client was behaving in a somewhat, quote, erratic behavior. There's certainly – Ms. McCombs' order of protection is not part of the record. No, I'm asking what the neighbor complained about that caused him to call the police. The neighbor is the one that called the police. Right. It's unclear as to what it is that the neighbor – according to Ms. McCombs, it was the neighbor that called the police. I'm assuming that Ms. McCombs would – of course, it would be lack of foundation and hearsay. But I guess you could infer that they felt like he was behaving in a way that violated an order of protection because that's what they told the police, that he had violated an order of protection. Or he was behaving in a manner that could violate the disorderly conduct statute. We don't know. That's not why he was arrested, Your Honor. Do we know that? Yes, it's undisputed in the party. He testified that he was arrested for violating an order of protection. There wasn't any contradictory evidence to that. Eventually, there weren't any charges filed. That's what he understood. That's why he was arrested. They did the search, and that's why he was released. Okay, but the only testimony we have is his, which the court didn't find so credible. Well, certainly not on that point, Your Honor. No, I understand. The trial judge in no way disputed his testimony with the fact that he had been arrested for violating an order of protection and came back into the neighborhood in kind of an agitated state. Now, trial court makes the finding that my client admitted that he was yelling. Admitting the presence in the photograph, admitting he was exercising outside. Admitting that he was yelling and making some of the statements listed in the petition. That's what she finds, Your Honor. There's absolutely no evidence to support any of those statements. Here's what he admits. He admits that that's an accurate photograph of his likeness. He does not admit that he knew who made the photograph because Ms. McCones was actually in the house. He denies that he ever yelled, yet the trial court makes a finding that he did yell. And even when we filed a motion for reconsideration, the trial court, I think, had to back off of that finding. And so, if we're back to me, all this man is doing is exercising in his yard on six occasions. And the trial court finds that as a basis for him and their neighbors. And the trial court finds that as a basis for alienating an order of protection. And so then we move on to the 29th, Your Honors, and we have a situation where Ms. McCones, obviously somebody that's close, not Ms. McCones, Ms. Grant, obviously somebody that's close to Ms. McCones, calls the police. My client is arrested for violating an order of protection when it's not in place. And he comes back in an agitated state and they say, well, we don't like the fact that you're coming into the neighborhood, back in the neighborhood in an agitated state. And he admits, he says, look, you guys have done that. You've done it now. You guys are going to court. We're going to go to court. We're going to settle this in court. And frankly, you know, there is other litigation going on between the parties here, but he was well within his rights to state something that I think is obvious. When he reports to the police that somebody's engaged in criminal conduct, and in fact you know that he hasn't engaged in criminal conduct, and then you complain about the reaction that has been made here. That's not a reasonable response for somebody seeking relief under the order of protection statute. You provoke somebody by getting them arrested. He comes back in a highly agitated state to say, well, I don't like the way he's talking to me. And so then you get an order, you go out and file a second order of protection. McGeehan, no evidence my client ever went on in Ms. McCone's property. What about the, I guess it's allegations to say that he stated, you're not coming back from this. And as I recall, there's something in the record about testimony about him charging at her. Your Honor, the only place where you can find in the record where we talk about, where it's at E28, and it goes on for about three pages. Okay. And he came back in, he stopped, he started screaming again, they say. Okay. And then they're talking, and he calls them liars. He calls them liars, which I think he's well, it's reasonable for him to do that under the circumstances because there was no order of protection. And then he goes to his house. That's when I'm going to page E30 of the transcript. So my point is this. When the trial judge, unlike the prior case, the trial judge did give basis for rulings twice. And basically what the trial judge said was, look, I find this becomes more credible than Mr. Gaddis because of inconsistencies in his testimony and how he testified. Well, I think it's pretty clear. I think the trial judge basically forgot. But if you look at page E91 of the transcript, the trial judge admitted that she looked at the documents in the criminal case in which they took judicial notice, which he took judicial notice. And so when we filed a motion for reconsideration, we said, look, we looked at the police reports and all of that, and they never took a statement from my client at all. So how could he have said anything that was inconsistent? And so I think what I think what happened was the trial judge said, well, this is inconsistent with what the police were reporting. But they didn't call the cop as a witness. But wasn't there some confusion as to really how much of that file she looked at? Well, on the motion for reconsideration, he says, no, I didn't look at it at all. I didn't look at it at all. And so then my response was, OK, Your Honor, in the plenary order of protection, you identified inconsistencies with regard to my client's testimony. And because of the inconsistencies of my client's testimony, I found Ms. McCombs more credible. That's the way I interpret her ruling. And so I said, OK, Your Honor, what inconsistencies? And it's not apparent in the record, but what actually happened, the trial court adjourned and went back to the office, I assume, to read the transcript and then came back and then attempted to identify some inconsistencies. There aren't any inconsistencies. Well, there's this other issue about the truck that he starts following and seems to kind of, I would describe it more as kind of a road rage thing. It was completely, I mean, the truck was looking as if it was lost. It's looking around. And then there's testimony about your client trying to block the truck and doing things. What was that all about then? There's no testimony of my client just trying to rock the truck. None. My client testified that he stayed in his vehicle at the same time. But the problem with the black truck is that that vehicle pulled into his driveway. To turn around. Well, no, no, that's not what happened because there's no evidence in the record where that man wasn't even called to testify. Ms. McCombs was in her house the whole time observing. And so she testified because there's a discussion between my client and the driver of the black truck that she felt threatened by that. Well, not even the trial court gave any credence to that. She wasn't over there helping. Oh, I'm sorry. I've run out of time. I hope I haven't waived my rebuttal. Thank you. Thank you. I need to watch that light more often. May I please report, Counselor Dunham? My name is Jonathan Cantrell and I represent the petitioner, Dorothy McCombs, in this case. I believe the issue in the case is relatively simple and more aptly stated as did the trial judge correctly apply the Stalking No Contact Order Act to the evidence as was presented, or was her application, rather, of the law of those facts against the manifest way of the evidence. The statute provides people like Ms. McCombs with a civil remedy. We're not charging Mr. Gaddis with any criminal charges here. We're not seeking any money damages. And the civil remedy is very finite. It's an order that automatically expires after two years. And as Mr. Dunham stated, there's bad blood between these parties. I think the statute is designed to apply in situations like this to prevent a bad situation from escalating into a worse situation. And as Mr. Dunham stated, these are next-door neighbors. And Ms. McCombs, as she testified at trial, is a 72-year-old, or actually was at the time, a 5'2-inch tall woman. And Mr. Gaddis is a relatively tall, mid-to-late 40-year-old man. And she lives alone, so it's understandable that he could strike an imposing or intimidating figure to her. The statute that applies in this case is very broadly written. All the petitioner has to show is that she's been a victim of stalking. And if she proves that, if the trial court finds that, the trial court doesn't even have discretion. The statute says if the trial court finds that the petitioner was a victim of stalking, then the order shall issue. And I'm paraphrasing, but that's in the statute. But the order has to be tailored in such a way that we don't trample on First Amendment rights, even. Correct, Your Honor. That's in the statute specifically as an exemption to the definition of stalking. And also, I think the trial judge tried to tailor this order in this particular case by reducing the distance to 25 feet. There was some testimony that the distance from the front door to the back door of his house to the property line is 25 feet. And so we agreed that he should be allowed to at least be on his own property at any time. And the trial judge tried to tailor the order to that situation, at least. Under the statute, stalking is a course of conduct, and the course of conduct is separately defined as two or more acts. So all she has to do is prove two or more acts that fall under the definition of stalking. There's a separate definition in the statute for contact with the victim. And that, I was stricken by how broad that is defined. It includes putting yourself in a position where you are visible to the petitioner. And the reason why that's important is Mr. Gaddis specifically admitted on cross-examination that when he would exercise outside, he knew he was in a position that would be visible from her house. He admitted that on cross-examination. Well, I want to interrupt you just a second. Yes, Your Honor. Because, again, one of the advantages we have is having read your briefs. But in the order that was entered by Judge Gill, she checks the fifth box, which is other injunctive relief as follows. And here's what she puts. Any and all attempts at communication will be considered harassment. So if he calls from 20, if he's standing 26 feet away and he says, hey, your dog got out, that in and of itself is automatically deemed harassment, which is an illegal finding. And that statement is to last until 2020. Right. So it seems, and then she goes on to say, this includes, as if you have the communication separate from what's included, all social media and third-party contact with petitioner. So a neighbor, if he talks to the neighbor and says, tell her her tree is on my property. I mean, it seems to me that that kind of language, any and all attempts at communication, not threatening communication but just communication, could be a little broad. What do you say to that? I agree, Your Honor, that that seems very broad. And I'm trying to recall the order. So how do we reconcile that language with the First Amendment rights that we have to be so very careful to guard for everybody in this country? Well, I think the trial court's intent was to play it safe, so to speak, no contact period. And what I'm trying to recall about pulling up the order is I believe that's preprinted language. And obviously I don't have that evidence. It's not on the record. But I believe that this particular county, they used that preprinted language in all these orders. Well, that doesn't make it right. I agree. And you're right. I mean, I'm looking at the order. It's C-26 in the record. And there is a form. And I don't know, as I sit here today, because I don't know what they do in Jackson. Williamson County. Williamson County, thank you. It is typed. It is typed. It's a different type font than the form, which is why I don't know. Right. But it seems to be, when you say any and all attempts at communication, there is a recent case out of the 1st District, which discusses this a little bit, which we're not bound to follow. But, you know, in reading this, I have some concerns about that kind of language. Sure, sure. So how are we to apply that? And, again, I may have bushwhacked you here, but I want to know how we reconcile that with the First Amendment. Well, I think the order is tailored to, although it's very broadly written, to apply to communications directed at the petitioner in this case. So I think when you balance the concern for safety, the concern that the relationship could devolve into something more serious, I think it's appropriate to use that kind of language in an order. You know, in the old days when we were, before you were born, the U.S. Supreme Court was faced with, in the Vietnam War era, they were faced with protesters who would stand in front of police and yell at them, you know, pigs, and provoke them. And our U.S. Supreme Court has said that's not enough. Sure. You know, those cases exist out there, and they're old, but I'm old. So that's just the reality of life. But you have a legal conclusion here where any attempt at communication is harassment, which is something that needs to be proved. So I know what you're saying. I know what the court is trying to do, but I want you to tell me why this doesn't trample on his First Amendment. Tell me why it doesn't. If you need to see the order, I'm happy to show it to you. Well, no, Your Honor. Okay. It's the same order in every stocking. Well, we don't want that. No contact order. You know, I'm not saying every, but this is not uncommon. And I'm not saying that makes it right, but this is not uncommon. And, Your Honor, I don't know if my recollection is correct, but I believe the right term is that this is narrowly tailored to the specific situation we're in. You know, two neighbors that obviously can't get along. One neighbor's behavior, you know, I should add, he cut tree limbs off of her tree and admitted to throwing them onto her property line. He admitted to speaking in a raised voice at a time when he was angry. She added that the statement was, you're not coming back from this. He didn't go so far as to admit that. I think the statute is narrowly tailored to apply in a situation like this where the General Assembly has decided that when it appears that something worse could happen, why not allow a trial court to enter a civil order of a very finite duration? And when the two years is up. That is not my issue. Really, it's not. My issue is the breadth of the language in paragraph five. I don't have a, I mean, I don't have any question about the 25 feet. I think that's reasonable. Some make it 100. I mean, you know. Right. But it's this typewritten language that is causing me some concern. And I understand the court's concern, Your Honor, and I'm sure that language could be. It's really my concern. I don't know if you can impute it to everybody. Well, the case could be remanded with a direction to address that particular language, and I think that would be appropriate. Although, given the other litigation that's going on between these parties, you know, what happened in this case, you know, I think the safe thing to do is to keep this order in place and to affirm the charge. So what you're saying is in situations where there could be a threat of real potential harm, and when we weigh this, perhaps this kind of order is not trampling on the First Amendment. I believe so, Your Honor. Because of the seriousness of the threat. That's what I believe, Your Honor, yes. Well, that's a valid balancing factor. And that's my opinion on it, Your Honor. And moving on to the facts just a little bit more. So what we've got in this case are multiple admissions by Mr. Gaddis. The cutting of the tree limbs and throwing them onto her property. Speaking loudly while in a state of anger, although she characterized it as a threat. He said, I was just upset and I raised my voice. And exercising in an area where he's visible to her. Those are three different admissions that all fall within the definition of a course of conduct, within the definition of stalking in the statute. In addition to those admissions, you've got Ms. McComb's testimony. And as Justice Overstreet mentioned, she did testify that he charged at her. That's on page E31 in the exhibits. She, as I stated, she said that his words were, you are not coming back from this. And she took it as a very threatening statement. She testified that she has altered her routine. She's afraid to go outside of her house alone, especially early in the mornings. The standard is a reasonable person standard in the petitioner's circumstances with the petitioner's knowledge of the respondent's prior acts. That's the standard as it's described in the statute. And so in this case, based on the bad blood, the previous litigation between these parties, the fact that she's a smaller elderly woman that lives alone, I think there's more than enough evidence to uphold the trial judge's decision. Certainly with a manifest way to the evidence standard, the opposite is not clearly evident in this case. And for those reasons, I would request the support of the lower court. Thank you. Thanks, counsel. Well, there's nothing in this record that would indicate that my client poses a serious threat to the safety of Ms. McCombs. There's just nothing. There's no showing that he's ever physically threatened her, that he's ever touched her, he's ever been on her property, he's angry with her. She's angry with him. What about this charging allegation? Well, take E31. This was after the black truck incident. Okay. My client is in his car. This is E31, line 13. And see, I'm not going to concede that because of the point is that if you really judge Gil's opinion, she's having to decide and make credibility determinations, and she decides credibility against my client because of the alleged inconsistencies in his testimony. And the simple fact of the matter is there are none. There are no inconsistencies. In oral argument, they didn't point to any inconsistencies in his testimony. And Judge Gil wasn't able to point out any inconsistencies. And in their brief, they didn't point out any inconsistencies. But here's what the facts are. We have E31. We're already, E31, we're already the black truck issue. My client is in his car, he says. And Gaddis eventually allowed the pickup truck to leave, but he followed him to 13, and then he followed him around the corner. So when Charles Winston and I were standing where Gaddis came up Bleacher Street, he was very slow in front of us, rolled down his window, yelled at us, and he says, you're not coming back from this. He's in his vehicle. Okay. Well, then we have E30. This is after, this is again at the time of the black truck, and he tried to leave and go into the driveway, and the police officer said, I want to talk to you, and Mr. Gaddis said, no, you can't come into the house. And rather than going to Mr. Gaddis' house, another police officer followed him and arrested him. So then we're back to E29, and he pulled into the house, he pulled into his driveway, and he thought it was, but then he came running down his driveway, stood at the foot of his driveway, and started yelling at us again. So in other words, he's running down his driveway, he's at the foot of his driveway, and he's yelling at Ms. McCombs. It's not like he's a bull in a china shop, and she's got a red flag, and he's chasing at her. She's 82 years old, and he's 45. He's 46, and he's down his driveway, and he's been arrested for violating an order of protection, and he's agitated. Now, I don't care how old she is, and she knows that Brenda Grant has done that. She has been instrumental in this man being arrested on false charges. And then she gets angry because he, but he came running down the driveway, stood at the foot of his driveway, and started yelling at us again. And so she's entitled to an order of protection for that. And then we have counsel, because I've got to look at the light here, I'm about to go. Exercising in your front, in your own yard. That's stalking. That's what, that's the argument that he just made. Exercising, now, if you want to talk about a violation of First Amendment rights, I mean, I could talk about cases that I studied in Laws of Money than before you were born, Your Honor. No, no, no, no. No, no, no. You're not that old. Oh, I think I've got you, my dear. Five years old. Thank you, Your Honor. Thank you, counsel, for your arguments. The court will take this matter under advisement, render a decision in due course. We're going to take a brief recess.